IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**FERREL THOMAS**, as Administrator )
of the Estate of Christian Alexander )
Tyson Thomas, Deceased, and )
Individually as the Natural Parent )
and Father of Christian Thomas, )
                                )
       Plaintiff, )
                                )
**JOHN P. FINUCAN**, )
**JACKIE R. NIETERT**, and )
**SEAN B. GIDEON** in their )
Individual Capacities, )
                                )
       Defendants. )

## <u>COMPLAINT FOR DAMAGES</u>
## <u>WITH JURY DEMAND</u>

COMES NOW, Plaintiff, FERREL THOMAS, as Administrator of the Estate of Christian Alexander Tyson Thomas, Deceased, and Individually as the Natural Parent and Father of CHRISTIAN THOMAS, and hereby files this Complaint for Damages against Defendants JOHN P. FINUCAN, JACKIE R. NIETERT, and SEAN B. GIDEON in their Individual Capacities, showing this Court as follows:

## <u>INTRODUCTION</u>

On July 18, 2025, a Cuyahoga County Grand Jury returned a no bill regarding this shooting incident based on evidence presented by the Attorney General Yost's

Special Prosecutions Unit.  Following this decision, the Ohio Bureau of Criminal Investigation (BCI) made public the evidence and information they collected regarding this incident but redacted all information identifying the three officers that discharged their firearms during this incident.   While Plaintiff has obtained the BCI file regarding this incident, due to the redactions of the identity of the three officers who discharged their weapons, Plaintiff is unable to determine with certainty, the actual identity of these three officers. As of the filing of this lawsuit, Plaintiff's request and attempts to confirm the identities of these three involved officers have been unsuccessful. Accordingly, Plaintiff has alleged claims against three officers, which based on current information and belief, are the officers who are the proper parties to this lawsuit.

## JURISDICTION AND VENUE

1.

This action is brought against Defendants JOHN P. FINUCAN, JACKIE R. NIETERT, and SEAN B. GIDEON pursuant to 42 U.S.C. §§ 1983 and 1988, and the Fourth and Fourteenth Amendments to the Constitution of the United States, as applied to the State of Ohio.  This action also contains state law claims against Defendants JOHN P. FINUCAN, JACKIE R. NIETERT, and SEAN B. GIDEON based on statutes and common law of the State of Ohio.

2

2.

This court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 1332, 1337, 1343, and 1391.  This is an action seeking damages greater than seventy-five thousand dollars ($75,000.00) exclusive of costs, interest, and attorney's fees. Plaintiff also invokes the supplemental jurisdiction of the Court to decide any asserted statutory and common law torts.

## PARTIES

3.

Plaintiff, FERREL THOMAS ("Plaintiff") files this action as the father of Christian Thomas, and as the Executor of the Estate of Christian Thomas.  During all times material to the subject incident, Plaintiff was and is a resident of Cuyahoga County, Ohio, residing at 1309 Yellowstone Road, Cleveland Heights, Ohio.

4.

Defendant JOHN P. FINUCAN ("Officer FINUCAN"), during all times relevant to this action, was employed as a police officer with the CLEVELAND HEIGHTS POLICE DEPARTMENT ("CHPD").  The actions of Officer FINUCAN that are the subject of this Complaint for Damages were undertaken in the regular course and scope of his employment as an officer with CHPD.  Officer FINUCAN is sued in his individual capacity and, upon information and belief, and resides within Cuyahoga County, Ohio, where he is subject to service of this lawsuit.

5.

Defendant SEAN B. GIDEON ("Lt. GIDEON"), during all times relevant to this action, was employed as a police officer with the CLEVELAND HEIGHTS POLICE DEPARTMENT ("CHPD").  The actions of Lt. GIDEON that are the subject of this Complaint for Damages were undertaken in the regular course and scope of his employment as officers with CHPD.  Lt. GIDEON is sued in his individual capacity and, upon information and belief, and resides within Geauga County, Ohio, where he is subject to service of this lawsuit.

6.

Defendant JACKIE R. NIETERT ("Officer NEITERT"), during all times relevant to this action, was employed as a police officer with the CLEVELAND HEIGHTS POLICE DEPARTMENT ("CHPD").  The actions of Officer NEITERT that are the subject of this Complaint for Damages were undertaken in the regular course and scope of his employment as an officer with CHPD.  Officer NIETERT is sued in his individual capacity and, upon information and belief, resides within Summit County, Ohio, where he is subject to service of this lawsuit.

## STATEMENT OF FACTS

7.

On August 29, 2024, at approximately 10:00 pm, CHPD officers were dispatched to Plaintiff's home at 1309 Yellowstone Road, Cleveland Heights, Ohio,

in a response to a 911 call from the home reporting that Plaintiff and Christian were arguing, and that Christian had fired a gun inside the home and was still armed with his finger on the trigger.

8.

The 911 call was made by Genesis Thomas, Christian's sister, who reported during the call that Christian had put the gun down and was being chased by Plaintiff. Genesis also reported to 911 that she heard a gunshot but was unsure of where the bullet hit.

9.

Upon arrival on the scene, Ondercin encountered Christian's sisters, Jacqueline and Genesis, who were outside in the front yard of the home with other CHPD officers.

10.

CHPD officers Elizabeth Perez, and Abrianna Franklin responded to the scene and positioned themselves at the rear of Plaintiff's residence to form a perimeter around the home. Other CHPD officers on the scene include Dallas Guyton, Matthew D. Cinadr, and Joseph W. El Biri.

11.

While Plaintiff and Christian were inside the home, Ondercin spoke to Plaintiff by phone and ordered him to leave the home.  According to reports, Plaintiff

came out through the front of the home temporarily, returned to the home, and then exited the home again and began talking to the police.

12.

Ondercin reports that while outside the front of the home, Christian came to the front door and yelled something, then slammed the front door shut, but he was unable to understand what Christian yelled and felt that Chrisitan was not acting coherently.  Christian did not fire the gun before retreating inside the home.

13.

Through a window, Ondercin observed Christian inside of the home pacing, which he reported to other CHPD officers on the scene, along with information that Christian was high or under the influence of hallucinogenic mushrooms.

14.

According to an investigation into this incident by the Bureau of Criminal Investigation (BCI), there were three (3) officers who discharged their weapons during this incident.  See, *BCI, Prosecutor Summary*, attached hereto as **Exhibit 1**, Page 2 of 65.

15.

The BCI report documents its investigative findings which are summarized in relevant part below regarding the events leading up to the three officers discharging their weapons.

16.

"The three officers were in the above-described approximate location [home directly north of the subject's home] when a loud percussive sound consistent with a gunshot followed by a loud crashing noise was heard coming from the back of the home." *Id.* at Page 12 of 65.

17.

"Approximately two seconds later the officers were in the same general positions when a second loud percussive sound was audible on multiple BWC recordings of the two officers surrounding the subject's home" and that "[t]his percussive sound was also consistent with a gunshot." *Id.*

18.

"Just prior to the sound of the second apparent gunshot, Officer Perez reported she saw the subject running through the three-seasons room at the rear of the home," and according to the BCI "[t]hers is no indication that any of the officers had fired their weapons at this point." *Id.* at Page 13 of 65.

19.

"Upon seeing the subject running across the three-seasons room from south to north, towards a wall of screened windows on the north side of the home, Officer Perez exclaimed 'Show me your hands!' and "[a]s officer Perez finished giving this

order, the second loud percussive sound consistent with a gunshot was captured on multiple BWC recordings." *Id.*

20.

"After running through the three-seasons room of the home, the subject jumped out/through the screened in window/wall on the north side of the home, landing below the wall of screened windows in an unlit side yard behind a small shrub like tree surrounded by other vegetation." *Id.*

21.

The BCI report documents through photographs and other evidence the location of the gun that Christian dropped or discarded at the time he jumped out the screened window on the north side of the home. *Id.* at Page 14 of 65.

22.

"Officer Perez's BWC captured the sound of the apparent second gunshot fired by the subject at frame 11,719 of her BWC recording" and "captured the sound of additional loud percussive noises consistent with gunshots again beginning around frame 11,806 of her BWC recording, approximately 5.803 seconds later." *Id.*

23.

The BCI's file redacts the names of the three officers who discharged their weapons, but the unredacted portion of the BCI report states the following regarding the order of shots fired:

> **(Redacted Officer's Name)** reported during an interview with BCI agents that he was the first officer to fire his weapon.  Immediately following the third loud percussive sound (the first shot fired by police), further loud percussive sounds quickly followed.  The following loud percussive sounds are believed to be the sound of gunshots fired by **(Redacted Officer's Name)**, and **(Redacted Officer's Name)**. The final loud percussive sound, consistent with a gunshot, began at/near frame 11,969 of Officer Perez's BWC recording, approximately 10.739 seconds after the first shot was fired by **(Redacted Officer's Name)**.

*Id.* at 14 of 65.

24.

The BCI report states that "[a] fired cartridge casing and teal-colored pistol were found discarded along the north side yard of the subject's home to the west of the window the subject jumped through."  *Id.*

25.

The BCI's crime scene analysis determined that "[t]wo cartridge casings were found that matched to the pistol discarded by the subject" and that "[t]he first cartridge casing matched the subject's pistol was located inside the home just inside the main door leading to the garage."  *Id.* at Page 18 of 65.

26.

Regarding the first cartridge casing, the BCI reported that "[a] bullet was found lodged in the back wall of the three seasons room that appeared consistent with having been shot from the general area of where the first cartridge casing was found" leading to the conclusion that "[t]his cartridge casing and bullet are believed to be the first shot fired by the subject while the officers were on scene and surrounding the home." *Id.*

27.

Regarding a second cartridge casing that was recovered from the scene, the BCI determined that it "scientifically matched to the pistol discarded by the subject, [which] was recovered outside the home along the northern side of the yard in close proximity to where the pistol was found." *Id.* at 19 of 65.

28.

According to the BCI, "the pistol and the second cartridge casing were found west of the window the subject jumped through" and "[b]oth of these items were recovered from the ground between the basement window and the outside of the fireplace as described in the image below." *Id.*

29.

The BCI obtained statements from each of the three officers who discharged their weapons during the incident, two of whom used a Colt M4 rifle, and the third officer a Glock pistol.

30.

Each of the three CHPD officers who discharged their weapons provided interviews to the BCI on September 19, 2024, and were each accompanied and represented by attorney, Dan Leffler from the Ohio Patrolmen's Benevolent Association (OPBA).

31.

"A total of **16** 5.56x45mm fired cartridge cases were recovered from the scene returned to **[Redacted Officer's Name]** firearm" all "located at the southwest corner of 1305 Yellowstone Road, in a flower bed."  *Id.* at 23 of 65.  (emphasis added).

32.

"A total of **four** 9mm fired cartridge casings [were] recovered from the scene returned to **[Redacted Officer's Name]** firearm" all "located in the front yard of 1309 Yellowstone Road." *Id.*  (emphasis added).

33.

"A total of **5** 5.56x45mm fired cartridge cases were recovered from the scene returned to **[Redacted Officer's Name]** firearm" all "located near the front yard

property lines of 1315 and 1321 Yellowstone Road." *Id.* at 26 of 65. (emphasis added).

34.

At no time during this incident, including the moment when Christian fired a second shot while exiting the home through the window, did Christian ever point or discharge a weapon at any CHPD officers.

35.

At no point during the time CHPD officers fired their weapons at Christian, did he ever point or discharge a weapon at any of his family members, who at the time Christian was shot and killed, were outside of the home standing in the front yard with CHPD officers.

36.

At no point during this incident did Christian ever make any threatening statements or gestures towards CHPD officers.

37.

While Christian fired a second shot as he was exiting the home through the window, the weapon in his possession was recovered near the window where Christian exited the home.

38.

The weapon in Christian's possession was recovered by the BCI without a magazine and was damaged and inoperable.

39.

The CHPD officers who shot and killed Christian admitted that they had poor visibility when they fired on Christian and were concerned that their crossfire would strike other officers or Christian's family who were in the standing in the front yard of the home along with CHPD officers.

40.

Ballistics evidence indicates that a total of 25 rounds were fired by three CHPD officers, and that the gun in Christian's possession was fired twice, once before officers arrived on the scene, and once when Christian exited the home through the window.

41.

The use of force by CHPD officers who fired a total of 25 shots at Christian was not objectively reasonable based on the totality of the circumstances known to the officers at the time.

42.

An audio and video recording of one of the two CHPD officers who discharged a Colt MF rifle during the incident revealed that CHPD officers

Ondercin, Guyton, Dugan, and Franklin, were all on the scene when he arrived with his partner, CHPD officer and trainee El Biri.  See *Officer Interview – Name Redacted*, attached as **Exhibit 2**.

43.

In describing his account immediately preceding and during the shooting, the above-referenced officer reported that he recalled hearing a pop from what he believed was a small caliber gun and then heard second pop, which is when he radioed "shots fired."  *Id.* at Page 5 of 9.

44.

This officer reported that after hearing the shots, he fired two to three times towards the front door of the home, although he did not know whether Christian had shot himself or was firing from the front door because it was very dark and there was very low visibility.  *Id.*

45.

This officer reported that he was not sure exactly where the gunfire came from that he heard prior to shooting his Colt MF rifle, but he thought it was coming from the general vicinity of the front of the house.

46.

In explaining the reason he fired, he stated that, "I was attempting to, you know, believed he had a handgun, the first pop, second pop, fired rounds into the

front door, um, in order to give covering fire for [redacted officer's name] here and the other officers, and um, Officer Guyton, and the family here, he was in the front door." *Id.* at Page 7 of 9.

47.

This officer reported that his point of aim was the front door, and that he believed Christian was firing his weapon - both the first and second popping sounds he heard, even though he admits that he did not see Christian when he fired his Colt MF rifle towards the front door, and that he stopped firing even before he saw Christian running. *Id.*

48.

This officer reported that at the time he observed Christian running away, he thought Christian was still armed because he had an odd posture, which made him think that Christian was firing behind himself towards the other officers, even though he admits that it was dark, and Christian was a significant distance away. *Id.* at Pages 7-8 of 9.

49.

Based on information and belief, NIETERT also fired a Colt MF rifle during this incident and reported to the BCI that he "returned fire on him" and "could see the subject at the time he fired the gun outside the home but could not tell where the

subject was aiming." <u>See</u> *Officer Interview – Name Redacted*, attached as **Exhibit 3**.

50.

NIETERT reported that "he was confident the sound he heard was the subject firing a gun" and that "[o]nce the subject fired, [Redacted Officer's Name] took a step to the left, crouched, and could see the subject's silhouette from the amber light coming from the house" and then "fired what he believed to be (26:46) 'probably about six shots in his direction." *Id.* at Page 6 of 8.

51.

NIETERT reported that he fired an additional round of shots as Christian ran past him, explaining that "I believed he was still armed at that point" and "I fired again, probably an additional, maybe uh, six to eight rounds" and then observed Christian fall face down onto the driveway. *Id.*

52.

According to the BCI, NIETERT reported that "he believed the subject was firing at officers when he fired his gun" but "did not believe he was being shot at himself as he did not think the subject saw him at the time he fired." *Id.* at Page 7 of 8.

53.

Based on information and belief, FINUCAN discharged his weapon, a Glock pistol. He reported to the BCI that immediately preceding the shooting, he heard a loud crash and heard officer Perez yell something to the effect of "show me your hands."  See *Officer Interview – Name Redacted*, attached as **Exhibit 4**.

54.

FINUCAN reported that he initially heard one gunshot but was unsure who had fired, so he began walking north towards the side yard between 1309 and 1305 Yellowstone Road, when he then heard a "volley of gunfire" causing him to return to cover behind the large tree in the front yard.  *Id.* at Page 5 of 6.

55.

FINUCAN reported that he was unable to observe anything and only heard the gunfire, but was able to discern the gunfire as rifle rounds due to the loud percussive sound.  *Id.*

56.

According to FINUCAN, the gunfire stopped for "one second" and he observed Chrisitan wearing no shirt and running from the side yard between 1309 and 1305 Yellowstone Road.

57.

FINUCAN reported that as Christian began running towards the roadway he then made a sharp right turn and began running towards the driveway at 1305 Yellowstone Road, explaining that, "I knew he had a gun and was possibly armed and a threat, that's when I began to go northbound, and I discharged my weapon" firing approximately 5-6 times as Christian was about 20 yards away.  *Id.*

58.

FINUCAN reported that while firing his weapon, he heard rifle rounds being fired and could not hear his own gunfire, but when the rifle rounds stopped firing, he stopped firing.  *Id.*

59.

After Christian collapsed to the ground, CHPD officers began yelling commands to Christian who did not respond, at which point, the officers formed into a "stack" and approached Christian, determined he was unarmed, and began to render aid to him.

60.

Defendants were aware at the time they discharged their weapons that Plaintiff and his two daughters were safe and outside of the home, standing in the front yard with CHPD officers, including Ondercin.

18

61.

No injuries were sustained or reported by any of Christian's family or officers who responded to the scene.

62.

Christian was 18 years old at the time of his death, which was due to gunshot wounds to his upper torso, upper extremities, and lower extremity.  An autopsy performed on Christian's body revealed nine (9) gunshot wounds.

63.

CHPD has a written policy that provides guidelines to its officers on the reasonable use of force.  See *Cleveland Heights Police Department, Policy 300, Use of Force*, attached as **Exhibit 5**.

64.

CHPD's policy on use force states that "Officers shall use only that amount of force that reasonably appears necessary given the facts and circumstances perceived by the officer at the time of the event to accomplish a legitimate law enforcement purpose."  *Id.* at Page 37.

65.

CHPD's policy on use of force states that "[t]he reasonableness of force will be judged from the perspective of a reasonable officer on the scene at the time of the incident."  *Id.*

66.

CHPD's policy on use of force states that "[w]hen determining whether to apply force and evaluating whether an officer has used reasonable force, a number of factors should be taken into consideration, as time and circumstances permit," including the "[i]mmediacy and severity of the threat to officers or others" - "[w]hether the conduct of the individual being confronted no longer reasonably appears to pose an imminent threat to the officer or others" - and "[t]he availability of other reasonable and feasible options and their effectiveness." *Id.* at Page 39.

67.

CHPD's policy regarding use of force states that "[u]se of deadly force is justified in the following circumstances involving imminent threat or imminent risk:

(a) An officer may use deadly force to protect themselves or others from what the officer reasonably believes is an imminent threat of death or serious bodily injury.

(b) An officer may use deadly force to stop a fleeing subject when the officer has probable cause to believe that the individual has committed, or intends to commit, a felony involving the infliction or threatened infliction of bodily injury or death, and the officer reasonably believes that there is an imminent risk of serious bodily injury or death to any other person if the individual is not

immediately apprehended. Under such circumstances, a verbal warning should preclude the use of deadly force, where feasible.

*Id.* at Page 41.

68.

As a direct and proximate result of the actions of Defendants, as described herein, Christian's clearly established state and federal statutory and constitutional rights were violated, which resulted in Christian experiencing physical injury and pain, emotional and psychological trauma, and eventually being deprived of his life when he was shot and killed by Defendants.

69.

As a further direct and proximate result of the wrongful death of Christian, his survivors, next of kin and/or his heirs have suffered permanent damages, including but not limited to grief, depression, and severe emotional distress. Plaintiff has incurred medical expenses, funeral bills, and other expenses.

**(Violation of 42 U.S.C. § 1983 and State Law Claims)**
**(Claims Against All Defendants Individually)**

70.

Plaintiff re-states and re-alleges the preceding allegations of the Complaint as though fully set forth herein.

## FOURTH AMENDMENT VIOLATION

71.

Each Defendant is a "person" under 42 U.S.C. § 1983 and during all times relevant were acting under color of law as police officer with CHPD.

72.

As officers with CHPD, Defendants are vested with the authority and duty to protect life and property, prevent crime, detect, arrest, prosecute offenders, preserve the public peace, and enforce the laws of the state of Ohio and local municipalities, ordinances, as well as the policies and procedures of CHPD.

73.

Defendants, while acting under color of law and with the authority of CHPD, negligently, recklessly, and intentionally acted in a manner that deprived Christian of his constitutional rights, including his rights under the Fourth Amendment of the United States Constitution.

74.

Defendants had a duty and responsibility to carry out their law enforcement duties with reverence for the sanctity of human life, and to use only the amount of force, which is necessary, proportional to the level of resistance, and objectively reasonable based on the totality of circumstances confronting them.

75.

Defendants had a duty and responsibility to take all reasonable measures to de-escalate an incident and reduce the likelihood or level of force. Any use of force that is not necessary, proportional, and objectively unreasonable and does not reflect reasonable de-escalation efforts, when safe and feasible to do so, is prohibited by CHPD.

76.

The use of force is regulated by state and federal law and is not left to the unregulated discretion of the officer, and thus a use of force decision is dictated by the actions of the resistant or combative subject, the law, CHPD policy, proper tactics, and training.

77.

Defendants were authorized to use deadly force to prevent the escape of a fleeing suspect only if they reasonably believed under the circumstances that it was necessary, and where feasible, some warning has been given, and there is probable cause to believe that: (a) the suspect would pose a continuing imminent threat of serious physical harm to Defendants or others, or (b) the escape of the suspect would pose an imminent danger of death or serious physical harm to the officer or to another if the suspect is not apprehended without delay.

78.

In the State of Ohio, the preservation of human life is of the highest value, and consistent with this value, Defendants were only authorized to use deadly force either to defend themselves from serious injury or death, or to defend another person from serious physical injury or death.

79.

In *Tennessee v. Garner*, 471 U.S. (1985), the Supreme Court held that an officer may not use deadly force to prevent the escape of a fleeing suspect unless there is probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others.

80.

In *Graham v. Connor*, 490 U.S. 386 (1989), the Supreme Court held that an objective reasonableness standard applies to a claim that a law enforcement officer has used excessive force during a seizure under the Fourth Amendment.

81.

Defendants use of deadly force during their encounter with Christian was not objectively reasonable to defend or protect themselves or another person from imminent serious physical injury or death.

82.

Defendants' actions and omissions, including their use of excessive and unreasonable deadly force against Christian, were the direct and proximate cause of Christian's death, and thus entitle Plaintiff to recover compensatory damages for Christian's wrongful death, pursuant to R.C. 2125.02 (B), including damages for loss of support, loss of services, mental anguish, and financial losses incurred due to Christian's death, such as medical, funeral and burial expenses. Plaintiff is also entitled to recover survivorship damages for Christian's physical injuries leading to conscious pain and suffering.

## SURVIVORSHIP ACTION

83.

Plaintiff re-states and re-alleges the preceding allegations of the Complaint as though fully set forth herein.

84.

As a result of this incident, Christian endured great conscious pain and suffering, anxiety, and fright.

85.

Christian filed no action for this matter during his lifetime, but under the laws of the State of Ohio, including R.C. § 2305.21, this action survives, including but

not limited to the causes of action set forth in this Complaint, and the compensatory and punitive damages that may be asserted by his estate.

## WRONGFUL DEATH

86.

Plaintiff re-states and re-alleges the preceding allegations of the Complaint as though fully set forth herein.

87.

As a direct and proximate result of Defendants' conduct as described herein, Plaintiff is entitled to recover damages under Ohio's Wrongful Death Statute, R.C. § 2125, et seq., for the wrongful death of Christian Thomas and for the loss of his services, protection, care, assistance, society, companionship, comfort, guidance, counsel, and advice: for their grief, depression, and severe emotional distress; for Christian's funeral and burial expenses; and for all other harm suffered by Plaintiff, to include any other applicable damages and claims for relief requested in this Complaint.

## LOSS OF CONSORTIUM

88.

Plaintiff re-states and re-alleges the preceding allegations of the Complaint as though fully set forth herein.

89.

Plaintiff, in his individual capacity as the father of Christian Thomas, claims damages for the permanent loss of the love and affection and support of his son, who died as a direct and proximate cause of the wrongful acts of Defendants.

## ASSAULT, BATTERY
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
## AND PUNITIVE DAMAGES

90.

Plaintiff re-states and re-alleges the preceding allegations of the Complaint as though fully set forth herein.

91.

As shown herein, Defendants shot and killed Chrisitan while he was unarmed and running and posed no imminent or significant threat of death or serious injury to Defendants or any others.

92.

Based on Defendants' intentional unjustified use of deadly force while Christian was unarmed and posed no imminent or significant threat of death or serious injury to Defendants or any others, Defendants' conduct gives rise to state law claims and liability against him for assault and battery.

93.

Under Ohio law, Defendants are liable to Plaintiff for assault and battery due to intentionally, willfully, and maliciously attempting to harm, and causing harm to Christian by shooting him multiple times without legal justification.

94.

Because the actions of Defendants towards Christian were intentional, extreme, outrageous, and reckless, causing Christian to experience severe emotional distress, Defendants' conduct gives rise to liability to Plaintiff for Christian's intentional infliction of emotional distress.

95.

The actions of Defendants in shooting Christian while he was unarmed and posed no imminent or significant threat of death or serious injury to Defendants or any others, was not only without legal justification, but was done with actual malice toward Christian, and with willful and wanton indifference, and deliberate and conscious disregard for his constitutional rights, entitling Plaintiff exemplary damages, pursuant to ORC 2744.01.

96.

Defendants are not entitled to qualified immunity, because their actions were malicious, reckless, and callously indifferent to clearly established and well-settled

federal and state constitutional and statutory law, which a reasonable person in their positions would have known.

97.

As a direct and proximate result of Defendants' actions, Plaintiff is entitled to all damages allowed under Ohio and federal law, including damages for physical and emotional pain and suffering, medical expenses, and punitive damages.

**WHEREFORE**, Plaintiff prays for judgement against Defendants, in an amount more than Seventy-Five Thousand Dollars ($75,000.00), for compensatory and punitive damages, for an award of attorney's fees pursuant to 42 U.S.C. § 1988, together with all costs incurred herein, pre-judgment and post-judgment interest, and any other relief the court deems appropriate.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

Respectfully submitted:

/s/ Stanley Jackson
Michael L. Wright, #0067698
Stanley Jackson, #0077011
Robert L. Gresham, #0082151
THE COCHRAN FIRM -
CLEVELAND
2000 Auburn Drive, Suite 200
Beachwood, Ohio 44122
(216) 333-3333 (Phone)
(513) 672-0184 (Fax)
mwright@yourohiolegalhelp.com
rgresham@yourohiolegalhelp.com
sjackson@cochranohio.com


Samuel L. Starks, #103924
245 Peachtree Center Avenue
1900 Marquis Tower One
Atlanta, Georgia 30303
(404) 343-3332 (Phone)
(404) 459-7063 (Fax)
sam@starkslawfirm.com
*Attorneys for Plaintiff*